IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:10CR3126 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| JAVIER GARCIA-HERNANDEZ, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Javier Garcia-Hernandez (Garcia-Hernandez) has filed a motion under 28 U.S.C. § 2255. I have conducted an initial review of the motion.[1] It plainly appears from the motion, any attached exhibits, and the record of prior proceedings that he is not entitled to relief.

## I. BACKGROUND

After a five-day jury trial, Garcia-Hernandez was sentenced to a mandatory term of life in prison. There is not the slightest doubt that he decided to roll the dice after knowing exactly what he was facing, after discussing the matter thoroughly with his lawyer, and after having engaged in plea negotiations with the government.

---

[1] Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts provides:

> The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order.

For example, consider the following exchange that took place immediately before trial:

> THE COURT: On June 13, 2011, appearing in our court record is filing number 45, a Notice of Information Regarding Prior Convictions pursuant to 21 U.S.C. Sections 841(b)(1) and 851.  It was filed by the government.
>
> I'll now ask -- the purpose of meeting outside the presence of the jury is to provide Mr. Javier Garcia-Hernandez with formal notice of that information and the consequences of that information.
>
> So I will now ask Ms. Fullerton to advise the defendant what the notice of information charges and what the consequent penalties are.
>
> MR. BERRY: Your Honor, I apologize for interrupting.  Mr. Javier Garcia-Hernandez wanted me to talk to Ms. Fullerton just briefly.  I think it will --
>
> THE COURT: Go ahead.
>
> MR. BERRY: -- just take a couple seconds.
>
> MS. FULLERTON: Can I have a moment, Your Honor?
>
> THE COURT: Sure.
>
> (An off-the-record discussion was had.)
>
> MS. FULLERTON: Do you need a minute or two?
>
> MR. BERRY: If I could just have a couple minutes.
>
> MS. FULLERTON: Okay.  Bill, why don't we go out in the hall.
>
> THE COURT: Hold on just a minute.  Did -- Would you like a continuance for about five minutes or so?

MR. BERRY: Yes, Your Honor.

THE COURT: All right.  We'll -- but no -- well, we'll -- we've got this jury waiting, so you got five minutes.  I'm coming back here in five minutes so everybody else get back here.  We stand in recess.

(A short recess was had.)

THE COURT: Mr. Berry, are you prepared to proceed?

MR. BERRY: We are, Your Honor.

THE COURT: All right.  All right.  I'll call upon Ms. Fullerton now to tell Mr. Garcia-Hernandez what the notice of information charges and what the consequences of the information are should the defendant be found guilty and should the prior convictions be proven.

MS. FULLERTON: Mr. Garcia-Hernandez, the government has filed a Notice of Information Regarding Prior Convictions pursuant to 21, U.S. Code, Sections 841(b)(1) and Section 851.  That information alleges that you were convicted on or about September 3rd, 1996, in the District Court for Woodbury County, Iowa, in a case entitled *State of Iowa vs. Carlos Alcozer*, criminal case number 46416, of the felony crime possession of cocaine with the intent to deliver, in violation of the laws of the State of Iowa.

Further, that you were convicted on or about July 23rd, 2003, in the Circuit Court of Minnehaha County, South Dakota, in a case entitled *State of South Dakota vs. Alberto Perez, also known as Javier Garcia-Hernandez*, case number 03-1323, of the felony crime of conspiracy to distribute more than one pound of marijuana, in violation of the laws of the State of South Dakota.

And that you were also convicted on or about January 5th, 2004, in the District Court of Cooke County, Texas, in a case entitled *State of Texas vs. Juan Aranada Jr., also known as Juan Aranda, Jr., also known as Javier Garcia-Hernandez*, case number 98-306, of the felony crime of

3

possession of a controlled substance, namely, cocaine, in an amount of 400 grams or more, in violation of the laws of the State of Texas.

It's alleged that those previously described convictions were final when you committed the offense charged in the indictment previously filed in this case, and, accordingly, you are given notice that the increased statutory penalty for Count I of the indictment, which charges you with conspiracy to distribute and possess with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of the Title 21, United States Code, Section 846, is a mandatory term of life imprisonment without release and a maximum fine of $20 million.

Do you understand the information and the al- -- the alleged prior convictions?

THE DEFENDANT: Yes.

MS. FULLERTON: Do you understand the possible penalty if you are found guilty of the charge in the indictment and found guilty of having the prior convictions?

THE DEFENDANT: Yes.

THE COURT: All right. Mr. Berry, may I confirm with you that this information does not come as a surprise to you or to your client?

MR. BERRY: No, it does not, Your Honor.

THE COURT: My understanding is that during plea negotiations this matter was extensively discussed between you and the counsel for the government and then you and your client; is that fair?

MR. BERRY: That's correct, Your Honor.  We discussed this matter as well as the sentencing guidelines and approximately where Mr. Javier Garcia-Hernandez would fall if he would -- would enter a plea in this case prior to this being -- the -- the new arraignment here today.

4

THE COURT: The new information.

MR. BERRY: Or the new information being filed, yes.

THE COURT: And did you discuss the consequences of the new information with your client?

MR. BERRY: Yes, Your Honor.

THE COURT: And that occurred some time ago?

MR. BERRY: Yes, Your Honor.

THE COURT: Mr. Garcia-Hernandez, did you hear what your lawyer just told me?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Is that true?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you have any questions about this notice of information?

THE DEFENDANT: No, Your Honor.

THE COURT: Counsel, let me now discuss with you the process that we should follow. In the past, I have handled the issue of aggravating prior crimes by having a hearing at the time of sentencing to determine whether the government can prove these crimes. Is that how you would like to proceed?

MS. FULLERTON: Yes, Your Honor.

THE COURT: Mr. Berry?

MR. BERRY: Yes, Your Honor.

THE COURT: Mr. Javier Garcia-Hernandez, is that how you would like to proceed?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you have any questions about that?

THE DEFENDANT: No, Your Honor.

THE COURT: All right.  We will proceed accordingly.  So we will not commit these issues to the jury; is that right?

MS. FULLERTON: Yes, Your Honor.

THE COURT: Is that right?

MR. BERRY: Yes, Your Honor.

THE COURT: Is that right, Mr. Garcia-Hernandez?

THE DEFENDANT: Yes, Your Honor.

(Filing 104 at CM/ECF pp. 2-7.)

The evidence at trial against Garcia-Hernandez was overwhelming. *See United States v. Garcia-Hernandez, 682 F.3d 767, 770-771 (8th Cir. 2012)* (affirming conviction and holding, among other things, that sufficient evidence supported jury's finding that defendant knew of the conspiracy and intentionally joined it).

The Court of Appeals described the overpowering evidence this way:

Garcia-Hernandez was charged in a one count indictment with conspiracy to distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine between January 2009 and May 2010. *See* 21 U.S.C. §§ 841(a)(1), (b)(1), 846. Prior to trial he moved to suppress the

evidence obtained during the search of his home, arguing that the warrant was not supported by probable cause. The warrant application had been accompanied by a 54 page affidavit, which was signed by a law enforcement officer involved in the investigation and which summarized information gathered by the police over the course of many months. The district court denied the motion, adopting the magistrate judge's recommendation.

The case proceeded to a five day trial at which the government called 17 witnesses and introduced several hundred exhibits to demonstrate Garcia-Hernandez's involvement in the methamphetamine conspiracy. A number of witnesses who had pled guilty to conspiracy charges testified pursuant to their plea agreements and linked Garcia-Hernandez to the conspiracy. They reported that he had sold large amounts of methamphetamine and coordinated drug transactions among others involved in the distribution scheme. Their testimony established that he used the alias "Alberto Perez" and was often called "Al."

J. Nicholas Cramer was one of the witnesses who had pled guilty to conspiracy charges. Cramer testified that he would contact Garcia-Hernandez when he wanted methamphetamine. Garcia-Hernandez would set up drug deals for him or sell him the drugs directly from his own home in half pound or one pound quantities. Garcia-Hernandez also acted as a translator for Cramer during drug transactions with Spanish speakers. Cramer testified that he bought a PT Cruiser from a coworker which had a hidden compartment in which he would place money. Someone under the direction of Garcia-Hernandez would then pick up the money and replace it with drugs. When Cramer was arrested in the fall of 2009, he had his wife pay Garcia-Hernandez for drug debts with a large amount of money and several cars. Cramer stated that he typically sold to a buyer in South Dakota. That buyer testified that he knew Cramer had a source in Nebraska named Al.

Delfino Rodriguez, who had also entered a guilty plea to the methamphetamine conspiracy, testified that he had known Garcia-Hernandez since 1997 and that the two had been involved in drug dealing even before the current conspiracy. Garcia-Hernandez contacted Rodriguez in 2009 asking for drugs, and Rodriguez twice sold him half

pound quantities of methamphetamine. Rodriguez stated that he had arranged with Garcia-Hernandez to sell the PT Cruiser to Cramer and that it was later given to Garcia-Hernandez as payment for a drug debt owed by Cramer.

Evidence was also presented about the results of video and physical surveillance of several of the residences associated with the drug operation. Coolers were observed being taken in and out of homes including that of Garcia-Hernandez, and cars of known drug dealers were seen coming and going from his house. Testimony was heard about methamphetamine transactions being conducted by leaving the drug in a plastic cooler in the garage at a dealer's home. Police also testified about buying drugs from persons associated with the drug conspiracy during undercover controlled buys.

Police officers testified about the large quantities of drugs they found during searches conducted at residences associated with the conspiracy. At an apartment rented by Rodriguez, police found a large amount of methamphetamine, a cooler, cash, and drug notes. In the garage they found a power washer with almost 500 grams of methamphetamine inside, plastic storage bins, and a cooler. In another garage rented by Rodriguez police discovered almost 500 grams of methamphetamine stored inside a car safe, along with cash, checkbooks belonging to Rodriguez, and a number of documents in the name of Alberto Perez. Rodriguez testified that the car, drugs, and money belonged to him and that he had been holding the documents for Garcia-Hernandez. A search of Garcia-Hernandez's residence did not uncover any drugs, but police found documents there belonging to Rodriguez.

*Id*.

Following his appeal, Garcia-Hernandez sought to inspect the jury wheel. I ruled that his representative could inspect the jury wheel, but the Clerk was not obligated to copy the records free of charge. He sought a writ of habeas corpus to force the government to bring him to Nebraska so he could inspect the jury wheel, but I denied the request. Garcia-Hernandez sought relief by way of motion for writ of mandamus, but the Court of Appeals denied it. (Filings 131 & 132.)

The record shows that an intern for the lawyer who previously represented the defendant had earlier been given access to the jury wheel information. (Filing 134 at CM/ECF p. 1.)[2] Nonetheless, after the petition for writ of mandamus was denied, I entered an order on September 24, 2013, and directed the Clerk to provide the defendant with 480 pages of jury wheel information, properly redacted, upon payment of $240 (the required copy charge per government schedule). (Filing 134.) According to the docket sheet, there is no record that the defendant availed himself of the opportunity to obtain those records.

## II. ANALYSIS

Garcia-Hernandez makes three claims in his motion: (1) he was denied effective assistance of counsel; (2) he was denied a fair trial and an impartial jury; and (3) he was denied due process because he was refused inspection of the jury wheel.  Each of these claims lack merit. In fact, they border on the frivolous.

### A. Claim One: Ineffective Assistance of Counsel

Regarding the first claim, the *Strickland* standard must be applied.  *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984) (announcing principles for evaluation of claims of ineffective assistance of counsel under the Sixth Amendment).  In order to prevail on a claim that defense counsel rendered ineffective assistance of counsel

---

[2]In fact, attached to Garcia-Hernandez's motion papers is a letter from his court-appointed counsel in the criminal case indicating that he would help review the records even though his appointment as counsel of record had expired due to the completion of the direct appeal, and counsel had not been appointed to assist with the post-conviction motion. (Filing 136 at CM/ECF p. 37.)

under *Strickland*, the claimant must establish two things.  He or she must establish (1) that "'counsel's representation fell below an objective standard of reasonableness,'"[3] and (2) that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[4]  *Nguyen v. United States*, 114 F.3d 699, 703-04 (8th Cir. 1997) (quoting *Strickland*, 466 U.S. at 688, 694).

An evidentiary hearing is unnecessary if the claimant makes an insufficient preliminary showing on either or both prongs or the record clearly contradicts the claimant's showing on either or both prongs.  *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995) (affirming denial of § 2255 motion without a hearing in the face of an ineffective-assistance-of-counsel claim; stating that no evidentiary hearing is required where "(1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact").

The primary argument raised by Garcia-Hernandez is that his lawyer never told him he could avoid a life sentence by pleading guilty before the government filed the

---

[3]A judge's "scrutiny of counsel's performance must be highly deferential" and the judge must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Reed v. United States*, 106 F.3d 231, 236 (8th Cir. 1997).  In other words, a judge should make "every effort" to "eliminate the distorting effects of hindsight" by examining the lawyer's performance from "counsel's perspective at the time" of the alleged error.  *Strickland*, 466 U.S. at 689.

[4]A "reasonable probability" is less than "more likely than not," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), but it is more than a possibility.  *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005).  It must be compelling enough to "undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.

information. As shown by the exchange between the lawyers, Garcia-Hernandez, and the undersigned prior to jury selection—reproduced in the "Background" section of this Memorandum and Order above—this assertion is simply not true. Consider the following exchange:

THE COURT: My understanding is that during plea negotiations this matter was extensively discussed between you and the counsel for the government and then you and your client; is that fair?

MR. BERRY: That's correct, Your Honor.  We discussed this matter as well as the sentencing guidelines and approximately where Mr. Javier Garcia-Hernandez would fall if he would -- would enter a plea in this case prior to this being -- the -- the new arraignment here today.

THE COURT: The new information.

MR. BERRY: Or the new information being filed, yes.

THE COURT: And did you discuss the consequences of the new information with your client?

MR. BERRY: Yes, Your Honor.

THE COURT: And that occurred some time ago?

MR. BERRY: Yes, Your Honor.

THE COURT: Mr. Garcia-Hernandez, did you hear what your lawyer just told me?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Is that true?

THE DEFENDANT: Yes, Your Honor.

(Filing 104 at CM/ECF p. 6.)

11

Garcia-Hernandez raises other arguments about the supposed deficiency of his zealous and experienced court-appointed lawyer. They are of the "make weight" variety and require no further examination. Even if I assume the truth of the alleged factual allegations, there is no reason to believe that the result of the case would have been different had the lawyer done something different given the overwhelming evidence that was presented against the defendant and that I heard as the trial judge.

### B. Claim Two: Denial of a Fair Trial and Impartial Jury

Although it is difficult to tell, Garcia-Hernandez apparently argues[5] that the grand jury and the trial jury were not composed of a fair cross-section of the community. This claim must be denied for a variety of reasons. Initially, to the degree the defendant bases his challenge on the Jury Selection and Service Act, 28 U.S.C. §§ 1861-1869, the claim fails because Garcia-Hernandez failed to object prior to the time required by the Act. *See* 28 U.S.C. § 1867 (a), (e) (providing the exclusive means for challenges under the Act and requiring that challenges to both grand and petit juries be lodged prior to voir dire, or within seven days of when the challenge could have been discovered, whichever is earlier).

Additionally, if Garcia-Hernandez asserts a constitutional claim, that claim also fails because he has provided nothing to suggest that Hispanics were *systematically* excluded.[6]  *See*, *e.g.*, *United States v. Rodriguez*, 581 F.3d 775, 790 (8th Cir. 2009)

---

[5]Garcia-Hernandez' claim is apparently based on this logic: (1) he is Hispanic; (2) there were no Hispanics on the panel summoned for his trial; and (3) he speculates that no Hispanics were on the grand jury.  For the sake of argument only, I assume the foregoing to be true.

[6]Our previous jury selection plan has survived "fair-cross-section" attacks in the past. *See*, *e.g.*, *United States v. Sanchez*, 156 F.3d 875, 879 (8th Cir. 1998) (absent proof that certain racial or ethnic groups faced obstacles in voter registration process, statistics showing that African-Americans, Hispanics, Asian-Americans, and Native Americans were less represented on jury wheels than in the general population were not sufficient

(applying *Duren v. Missouri*, 439 U.S. 357 (1979), and holding that the defendant failed to establish that African-Americans and Hispanics were systematically excluded from jury pools in the District of North Dakota).

Finally, this claim could have been asserted on direct appeal, and it is, therefore, defaulted because it was not raised on direct appeal. *See*, *e.g.*, *Peltier v. United States*, 867 F.2d 1125, 1126 (8th Cir. 1989) (concluding that because claim was not raised on direct appeal, defendant waived review of § 2255 claim that Native Americans constituted the largest racial minority in the district but members of this group were rarely summoned).

To the extent the defendant tries to avoid the waiver problem by attacking his counsel, that effort fails as well. Like the Court of Appeals, I also reject this claim because "[t]here is no reason here to question the selective judgment of . . . appellate counsel, particularly since past discrimination claims against this District's jury selection plan have proved unsuccessful." *Id.* It is clear that court-appointed counsel made a tactical decision not to raise such a claim because the case law was against him, and he so advised Garcia-Hernandez. (Filing 136 at CM/ECF p. 39 ("In response to your recent letter, I have attached a case from the Eighth Circuit out of Nebraska specifically dealing with a jury wheel issue. The Court previously resisted a type of challenge that I believe you intend to argue.").)

---

to establish violation of Sixth Amendment's fair-cross-section requirement based on district court's method of jury selection, under which potential jurors in the district were drawn exclusively from voter registration lists of each of the state's 93 counties).

Our amended Plan for Random Jury Selection was approved by the Eighth Circuit Judicial Council on March 3, 2010. It provides that all persons who are registered to vote, who hold driver's licenses or who have state-issued identification cards are potential grand and petit jurors. *See Plan for Random Jury Selection for the District of Nebraska*, § 5, http://www.ned.uscourts.gov/internetDocs/jury/NebrJuryPlan.pdf. Section 15 of that document provides that "The contents of records and papers used in connection with the jury selection process will not be disclosed except as provided in this plan and by the provisions of 28 U.S.C. §1867(f)."

### *C. Claim Three: Denial of Jury Wheel Information*

Garcia-Hernandez argues that he was denied access to jury wheel information. *See* 28 U.S.C. § 1867(f) (disclosure provisions). The files and records, set forth in detail in the "Background" section of this Memorandum and Order, show that this claim is false.

First, a representative of his former lawyer was allowed access to the jury wheel information. Second, I ordered the Clerk to provide Garcia-Hernandez with over 400 pages of properly redacted jury wheel information if he would only pay the standard federal copying charges. He made no effort to do so.

Finally, even if there was some noncompliance with the requirements of the Jury Selection and Service Act regarding disclosure of information, a "violation of the Act . . . constitutes grounds for reversal only if it amounts to a 'substantial failure' to comply with the statute." *United States v. Capone*, 683 F.2d 582, 589 (1st Cir. 1982) (citing 28 U.S.C. § 1867). Garcia-Hernandez has not come close to making such a showing.

IT IS ORDERED that:

1.    The Motion to Vacate under 28 U.S.C. § 2255 (Filing 135) is denied and dismissed with prejudice.

2.    No certificate of appealability will be issued.

3.    A separate judgment will be issued.

DATED this 13ᵗʰ day of May, 2014.

BY THE COURT:
*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.